291 So.2d 449 (1974)
Joe Allen CARLISLE, Plaintiff-Appellant,
v.
GREAT AMERICAN INSURANCE COMPANY et al., Defendants-Appellees.
No. 12205.
Court of Appeal of Louisiana, Second Circuit.
January 8, 1974.
Rehearing Denied February 12, 1974.
Writs Refused April 5, 1974.
*450 Bruscato & Loomis by Albert E. Loomis, III, Monroe, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh, by J. Bachman Lee, Monroe, for defendants-appellees.
Before AYRES, BOLIN and WILLIAMS, JJ.
BOLIN, Judge.
On September 24, 1971, plaintiff, while employed as a common laborer for Hibbard-Mahoney Construction Company, received accidental injuries to his right arm. Plaintiff instituted this action against his employer and its insurer, Great American Insurance Company, for workmen's compensation benefits for being totally and permanently disabled, plus penalties and attorney's fees, less benefits previously paid. For written reasons the lower court found plaintiff was entitled to benefits only for the permanent partial [20%] loss of a physical function [an arm] and rejected his demands for penalties and attorney's fees. From this judgment plaintiff appeals. We disagree with that portion of the judgment failing to award plaintiff benefits for total and permanent disability.
A summary of the pretrial statement signed by the attorneys and filed in the record reflects there are two issues before this court: (1) did the injuries received by plaintiff on September 24, 1971 entitle him to receive benefits under the total and permanent disability section of Louisiana Workmen's Compensation Act [La.R.S. 23:1221(2)], or to benefits for only the permanent partial loss of use or function *451 of a specific member of the body under R. S. 23-1221 (4) (o); (2) is plaintiff entitled to recover statutory penalties and attorney's fees against defendant insurer for having acted arbitrarily, capriciously and without probable cause in discontinuing and later reducing compensation payments due the employee?
A study of the record has convinced us there is little dispute as to the facts relating to the crucial question of the nature and extent of plaintiff's disability. At the time of his injury plaintiff was 20 years old and had been in the common labor market since age eighteen. His duties with Hibbard-Mahoney were those of a general common laborer and ranged in nature from picking up trash around construction sites to lifting 150-pound objects. He had been working for Hibbard-Mahoney approximately three weeks when he was injured. Prior to that he had worked as a common laborer for a furniture manufacturer. When he was 18 years old he was employed by International Paper Company where he worked on a continuous daily basis aiding in unloading and loading concrete slabs weighing approximately four or five hundred pounds.
The record establishes that plaintiff was a conscientious, hard worker. He testified he was approximately six feet two inches tall and weighed about 175 pounds.
The injury made the basis of this suit was to his right arm, specifically his right elbow. He was treated extensively by Dr. Roy H. Ledbetter, Jr., an orthopedic surgeon of Monroe. Without going into the details of this treatment, it is only necessary to state the head of the radius was surgically removed. Dr. Ledbetter wrote a letter on April 4, 1972, concluding plaintiff's convalescence would take approximately six to eight weeks. Dr. Ledbetter's final diagnosis, as evidenced by his written correspondence, medical reports and deposition, was that plaintiff had a permanent limitation of full extension of his right arm of 15 degrees and an estimated 20% permanent disability as applied to the "right upper extremity" as a whole.
After being discharged by Dr. Ledbetter on October 12, 1972, and having drawn workmen's compensation payments for total disability for approximately 50 weeks, plaintiff obtained employment in Arkansas with a roofing contractor. On this job he also performs common labor necessitating the lifting of tar buckets weighing approximately 15 pounds, pushing a wheelbarrow weighing in excess of 100 pounds, and the normal and incidental clean-up work connected with this type of employment. He had worked for the roofing company for approximately two months, which was the job he had at time of trial.
At the suggestion of his counsel, plaintiff was examined by Dr. Ernest R. Hartmann, an orthopedist of El Dorado, Arkansas. Dr. Hartmann submitted a written report and also testified by deposition. His findings and conclusions were basically the same as those of Dr. Ledbetter.
In rejecting plaintiff's demands for total and permanent disability the trial judge wrote a comprehensive opinion. In this opinion he correctly stated:
"Dr. Ledbetter testified that the plaintiff can compete in the common labor market, can perform the duties of a normal common laborer without any undue pain or adverse effects, and that his lifting ability is nearly normal. Dr. Ernest R. Hartmann, who had examined the claimant for his attorney about two months after surgery, expressed his opinion that the plaintiff could perform any function of a construction laborer and that he had the ability to go back into the common labor market and compete. . . ."
However, the testimony of each of the physicians in reaching his conclusion not only deserves fuller discussion but is, we believe, decisive of the extent of plaintiff's disability. For example, when Dr. Ledbetter was questioned as to whether plaintiff could compete "equally with the next person *452 or could he physically do heavy, tough, heavy work during the work day? A job that classified as heavy work? Or strenuous work?", he answered:
"Well, I don't think he could compete on a completely equal basis. I think that he will be able to do certain strenuous activities. As a matter of fact, he can do most of them. But, I think the arm will fatigue more easily and with repetitive attempts or with repeated attempts to do heavy labor and lifting, the arm would fatigue. He would have some discomfort that would require him to rest or not be able to perform this repeatedly throughout the full day's work."

* * * * * *
"Q. Based on your medical treatment of Mr. Carlisle and your medical background, Dr. Ledbetter, in the field ofas an expert in the field of orthopedics, if Mr. Carlisle had a choice of jobs based on his functional use of that right arm, his ability to perform, what type of worklight, moderate or heavy would you recommend for Mr. Carlisle to get into?
A. Light or moderate. Light and moderate or moderate.
Q. And you'd feel like that he should, if he had a choice of jobs, not perform or be employed where heavy or strenuous work is demanded?
A. On a consistent all-day basis, I would recommend to him that he not do this, where such activities were required of him. Isolated incidents during the day, I think that would be within his capability."
On cross-examination Dr. Ledbetter responded to questions as follows:
"Q. What about his lifting ability? Is Mr. Carlisle able to lift like the normal person?
A. Nearly normal; yes.
Q. Sufficient to get by in most any work activity he would do?
A. I think so; but, not, as I stated previously, on a repetitive activity, where he has to lift heavy objects repeatedly during the course of an hour or two or day, I don't think he could do it under the present circumstances."
Dr. Ledbetter's conclusion that plaintiff could compete in the common labor market is perhaps best explained by the following portion of his testimony on cross-examination:
"Q. . . . You do feel, though, that Mr. Carlisle, Joe Allen Carlisle, can compete in the common labor market?
A. Yes.
Q. And you do feel like, do you not, that work will actually benefit him? Is actually good for him?
A. Yes. Yes, I do. And, I'll qualify my first answer. His ability to compete in the labor market, within the limitations that we've set forth in previous remarks.
Q. In other words, that he should not do full-time heavy lifting or full-time any real heavy work?
A. That's correct. That's right.
Q. Without resting?
A. Yes."
This is a case in which it might easily be said that plaintiff was his own worst witness. In fact, the district judge stated in his written reasons:
"However, the strongest case against total and permanent disability seems to rest in the testimony of Mr. Carlisle himself. At the time of the trial he had been working for a couple of months for a roofing concern in Little Rock, Arkansas as a common laborer. He had never revealed his disability to his employer or *453 any of his supervisors; had been able to conceal such disability by consistently performing all the duties of his job; and had never required the assistance of any of his fellow employees to perform any part of his job. The duties of his employment were consistent with those required of most common laborers. He further testified that he could in fact, with very few exceptions, perform almost every duty of every job he had held during his working lifetime.
"The record reveals that the plaintiff is basically performing the same type of work he was employed to do at the time of his injury.. . ."
The record substantiates this statement. However, we cannot read this record without being impressed by the frank and straightforward answers plaintiff gave to every question. Therefore, in all fairness, his testimony must be considered in its entirety in order to arrive at his true version of the accident and resulting disability. For example, plaintiff testified the positions he had held in the past could be classified as either heavy, moderate, or light work. He said he would classify his job duties with the roofing company as being moderate work. When asked if he had done heavy, strenuous work in the past the record reflects the following:
"A. Yes, sir.
Q. Do you feel like that you could perform that job if you had to do it?
A. No, sir. Not a heavy, strenuous job, no, sir. I mean I could to an extent but I wouldn't last all day.
Q. You know the jobs you've performed in the past. Right?
A. Yes, sir.
Q. You've done them?
A. Right.
Q. Do you feel like you could go through and do that job as instructed a whole given work day?
A. No, sir."
In must be conceded that plaintiff testified, in essence, he could perform all the duties he was performing at the time he was injured; in fact, he said he could even do heavy, strenuous labor for a short period of time. However, it is equally clear that he testified he could not perform any job requiring heavy lifting or strenuous work for a full eight-hour day. Upon cross-examination he said that he could not perform this heavy work even if he were allowed the normal hourly ten-minute breaks during the day, and the medical testimony supports this conclusion.
The jurisprudence has established the rule that a common laborer will be considered as being totally disabled from doing work of any reasonable character within the meaning of the Louisiana Workmen's Compensation Act if his injuries disabled him from performing work of a kind similar to that which he was accustomed to performing, or if his injury is of such a character that it appears he will be substantially handicapped in competing with other able-bodied workers in the regular common labor market. Stephney v. Robertson (La.App. 4th Cir. 1969) 219 So. 2d 9, and numerous cases cited.
The evidence in this case is uncontradicted that at the time of trial plaintiff was able to return to his work as a roofer's helper and perform all of the duties in connection therewith, but he was not able to perform any type of common labor that required repeated lifting of heavy objects or strenuous, hard work during an entire eight-hour work day. Under these circumstances we think it would be contrary to the intent of the Workmen's Compensation Act to find that a 20-year-old man, qualified to do only manual labor, would not be substantially handicapped in competing with other able-bodied workers in the flexible common labor market. We find plaintiff is totally and permanently disabled within the meaning of the Louisiana Workmen's Compensation Act.
We next consider the question of the correctness of the lower court's judgment rejecting *454 plaintiff's demand for statutory penalties and attorney's fees.
From the date of the accident on September 24, 1971 until September 18, 1972, defendant insurer paid plaintiff compensation benefits at the rate of $49.00 per week. The only medical reports available to the insurer during this period were those of Dr. Ledbetter. The first such report was dated September 30, 1971, and the next was dated April 4, 1972.
In Dr. Ledbetter's report of April 4, 1972, he concluded the operative wound [excision of the head of the radius] had healed without complication and that he "would anticipate a convalescence of an additional six to eight weeks". Numerous requests were made for follow-up reports from the treating physician but none was received. The insurance company's claims manager, having been in regular contact with plaintiff's attorney, advised the latter by letter dated September 20, 1972, that weekly benefits were being suspended. In this letter it was stated:
"I do not imply disbelief in your verbal assurance that your client continues to be disabled. It is simply a matter that I can no longer rely on a six month old report to justify paying weekly benefits. Therefore, I have no alternative but to suspend weekly benefits until such time as we receive, a current written report from the treating physician that Mr. Carlisle is indeed disabled."
Unknown to the insurer, plaintiff had been examined on June 26, 1972 by Dr. Hartmann at El Dorado, Arkansas, and his report, estimating plaintiff's permanent partial disabilitw of the arm, had been mailed to plaintiff's attorney on June 28, 1972. When Dr. Ledbetter's final report, dated October 12, 1972, was received estimating a permanent partial disability of 20% as applied to the right upper extremity, it was agreed by plaintiff and the insurer to seek additional information. This additional information, pertaining to plaintiff's inability to perform strenuous labor requiring lifting of heavy objects, was furnished by a letter dated November 16, 1972, addressed to plaintiff's attorney. On November 22, 1972 the insurer's claims manager placed a check in the mail bringing the benefits for total and permanent disability up to date through October 13, 1972, and at the estimated partial disability rate from October 14, 1972 forward.
Plaintiff contends the defendant's suspension of all compensation benefits on September 20, 1972 was arbitrary, capricious and without probable cause; further, that the reduction of the weekly benefits to a percentage of loss of function of a specific member on a proportionate basis was likewise arbitrary.
Considering all of the circumstances, we find that defendant insurer's actions in suspending benefits were not arbitrary, capricious or without probable cause. Accordingly, plaintiff's demands for statutory penalties and attorney's fees were properly denied.
For the reasons assigned the judgment of the lower court is annulled and set aside and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Joe Allen Carlisle, and against defendants, Hibbard-Mahoney Construction Company and Great American Insurance Company, in solido, awarding plaintiff compensation at the rate of $49.00 per week beginning September 24, 1971, and weekly thereafter during the period of his disability not to exceed 500 weeks, with seven per cent interest thereon from the date each weekly payment becomes due until paid, less the amount previously paid.
It is further ordered that plaintiff's demands against Great American Insurance Company for penalties and attorney's fees be rejected.
It is further ordered that the expert witness fees of Dr. Roy H. Ledbetter and Dr. Ernest R. Hartmann be fixed at $50 each *455 and taxed as part of the costs of this cause.
It is further ordered that defendants pay all costs of these proceedings, including the cost of this appeal.