AUGUSTINE, Judge.
By this appeal, defendant Johns-Mans-ville Corporation (J-M) seeks to reverse an award of workmen’s compensation benefits in favor of its former employee, Pat Hawkins.[1] Plaintiff’s claim arises under La.R.S. 23:1031.1 of the Louisiana Workmen’s Compensation Act, as it existed prior to amendment in 1975. He alleges total and permanent disability as a result of having contracted asbestosis while in the employ of J-M.
The parties, Hawkins and J-M, stipulated that between 1948 and 1966, plaintiff was employed by J-M as a common laborer and that, during that time, J-M manufactured various products from raw asbestos material.
At trial, Mr. Hawkins testified that for many years he worked in that part of the plant which produced asbestos shingles. As he described it, the air was often so dense with asbestos dust that it hung like a fog, requiring workers to wear masks which, theoretically at least, reduced the risk of contracting lung disease. Mr. Hawkins left J-M in 1966 after having worked there for eighteen years. Afterward, he was employed as a common laborer on the river front, then at a chicory factory, and then at a Coca-Cola plant. In 1979, Mr. Hawkins performed light janitorial work for a local restaurant, but had left this job as of the time of trial. In 1980, he began to complain of shortness of breath and sought the advice of Dr. Morton Brown, a specialist in pulmonary diseases. After noting plaintiff’s history and performing several exami *727 nations, particularly x-rays, Dr. Brown diagnosed Mr. Hawkins’ condition as asbestosis, a progressive disease which results from scarring of the lungs by exposure to asbestos dust. Because of this scarring, the lungs have less capacity and furnish less oxygen to the victim’s blood.
The x-rays obtained by Dr. Brown were not the first indications of lung disease. Periodically, J-M conducted physical examinations of its employees to determine, among other things, whether exposure to asbestos or silica dust might have affected the workers’ lungs. Plaintiff’s x-rays, taken at yearly intervals between 1948 and 1966 (at the instance of J-M) were interpreted by Dr. Brown as confirming progressive deterioration of the lungs and the presence of asbestosis. Thus, Dr. Brown testified that x-rays taken in 1948 (at the outset of Mr. Hawkins’ employment and before exposure to asbestos) reveal no pulmonary abnormalities. X-rays taken in 1962 and 1964, however, show the first signs of the disease’s progression: there Dr. Brown detected “smudges” which he tentatively interpreted as “infiltrates” or scars on the plaintiff’s lungs. Evidence of lung deterioration was more discernible to Dr. Brown in x-rays taken in 1966, two years later. These indicated more numerous and defined marks or scars in the apices of the plaintiff’s lungs. As of that date, according to Dr. Brown,'the plaintiff’s disease had clearly begun to run its course. He explained that scarring of the lungs continues as the body tries unsuccessfully to “digest” or eliminate asbestos particles which, as he put it, are nothing other than microscopic rock. Dr. Brown analyzed the plaintiff’s most recent x-rays, taken in 1980, and found increased linear nodulations and interstitial fibrosis in both upper lungs — in the doctor’s opinion, the diseased reaction of the body to asbestos dust. In addition, these films indicated bilateral pleural thickening which, according to Dr. Brown, is one of the hallmarks of prolonged exposure to asbestos.
Dr. Brown’s findings were consistent with the independent report of Dr. Don McCormick, a radiologist at Jo Ellen Smith Hospital, who stated that Mr. Hawkins’ x-rays, taken in July 1980, revealed pleural thickening and bilateral interstitial fibrosis.
The plaintiff also submitted the medical reports of Dr. Samuel Logan, who in 1964 had been called upon by defendant J-M to examine employees and to interpret their x-rays with the particular objective to find lung abnormalities caused by exposure to asbestos. That year, Dr. Logan issued a report which classified Mr. Hawkins’ condition as “M-1”, which at trial, was explained by the doctor to mean “peribronchial infiltration or mixed scarring. Mixed could be silica, asbestos, or any of the other numerous kinds of foreign matter that collects in the lungs.” His report went on to remark, “probably asbestosis. Avoid all fumes and dust.”[2] Emphasis supplied.
Further corroboration of Dr. Brown’s diagnosis is found in plaintiff’s pulmonary function report from Jo Ellen Smith Hospital, dated July 10, 1980, which states that “the results are consistent with a restrictive, as well as an obstructive defect, most probably as one sees with chronic obstructive lung disease.”
In contradiction to the medical testimony offered by the plaintiff, J-M presented the expert opinion of Dr. Hans Weil, a noted specialist in the field of pulmonary diseases who examined the plaintiff on January 19, 1981. In taking the plaintiff’s history, Dr. Weil recorded that Mr. Hawkins was sixty-one years of age and had worked at the J-M plant for eighteen years as of 1968,[3] when he was “laid off” for non-medical reasons. Significantly, Dr. Weil noted that “there has been no shortness of breath . . . nor history of chest pain, edema,[4] nocturnal *728 dyspnea,[5] or orthopnea[6]”,[7] and further, that plaintiff has smoked one pack of cigarettes per day for over forty years. Examination of the chest revealed adequate thoracic expansion without delay of the expiratory phase. Dr. Weil detected no crackling or wheezing in the plaintiffs lungs.
His examination of Mr. Hawkins’ x-rays revealed “bilateral linear and nodular densities within the apices of both upper lobes (of the lungs), suggesting an old granulo-matous infection such as tuberculosis. . . No pleural abnormalities are present.” Studies of pulmonary function were performed by Dr. Weil, and showed Mr. Hawkins’ lungs to be functioning in the lower normal range “with the possible exception of a modest degree of hyperinflation.” Dr. Weil’s ultimate finding was that “radio-graphic evidence of diffuse pulmonary or pleural fibrosis is lacking . . . there is no evidence of a work-related respiratory disorder.” Dr. Weil’s trial testimony served principally to repeat his earlier written findings and to explain to the court their significance with regard to his ultimate conclusion that the disease which afflicted Mr. Hawkins was not asbestosis, but rather tuberculosis. First, Dr. Weil explained that asbestosis produces linear densities of the kind that were not observable on Mr. Hawkins’ x-rays. Second, the probability that nodulation within plaintiff’s lungs was due to tuberculosis was enhanced by the fact that in 1972, plaintiff’s tuberculin skin tests converted from negative to positive. Third, Mr. Hawkins lung function tests were in the normal range. These tests measure three things: the volume of gas within the lungs and therefore the volume of the lungs themselves; conduction of air in and out of the lungs (flow rates); and the efficiency of gas exchange within the lungs. Dr. Weil found no reduction in the plaintiff’s rate of exhalation, and concluded that he did not have any airway obstruction. He also stated that any fibrosis or scarring within the lungs would have been revealed through these tests: total lung capacity, vital capacity and diffusing capacity would have shown reduction from the normal level. Mr. Hawkins’ functions showed no such reduction.
Several observations can be made at this point concerning these doctors’ contradictory findings. With regard to the analysis of the plaintiff’s x-rays, there is no dispute between the doctors that these films do in fact reveal bilateral linear and nodular densities. Ordinarily, it is very difficult, on the basis of x-rays alone, to determine whether the marks and “smudges” on the plaintiff’s films represent asbestosis. It is apparent from the doctors’ testimony that interpretation of these x-rays is largely a subjective matter over which experts might reasonably disagree. Proper diagnosis of the patient’s condition therefore requires that these films be interpreted in light of the patient’s history and the more objective informants, particularly lung function studies.
In this case, however, resolution of the factual dispute is complicated by the fact that Mr. Hawkins’ pulmonary function reports are at variance with each other: those performed by Dr. Weil reveal only slight abnormality — hyperinflation; those performed by Jo Ellen Smith Hospital indicate decrease in vital capacity and in flow rate, results which are consistent with the presence of asbestosis. In light of these contradictory findings, the trial court apparently accorded great weight to the opinion of Dr. Don McCormick, the Jo Ellen Smith radiologist whose report corroborates the diagnosis of Dr. Brown and contradicts the x-ray interpretations of Dr. Weil. Dr. McCormick, it will be remembered, found that plaintiff’s x-rays revealed pleural thickening and bilateral interstitial fibrosis (or scarring). We also assign considerable *729 weight to the 1964 report of J-M’s company physician, Dr. Logan, who then stated that the abnormal marks on plaintiff’s film were “probably asbestosis.”
In resolving this dispute, we are reminded that appellate courts are admonished to pay great deference to the trial court’s factual findings, which must not be disturbed unless the error of those findings is clear and manifest. Crump v. Hartford Accident and Indemnity Co., 367 So.2d 300 (La.1979); Canter v. Koehring, 283 So.2d 716 (La.1973). We are unable to say that the trial court committed “manifest error” in finding that Pat Hawkins is afflicted by the lung disease “asbestosis.”
The question which remains is whether asbestosis has rendered the plaintiff “totally and permanently disabled”, as that term has been understood by our jurisprudence.
Inasmuch as the plaintiff’s disease was contracted prior to 1975, we shall discuss his status in light of the law in effect prior to the 1975 amendments of the Workmen’s Compensation Statute. Laurendine v. Fischback and Moore, Inc., 398 So.2d 1220 (La.App. 4th Cir. 1981).
Prior to the 1975 amendments, the pertinent section of the workmen’s compensation statute, La.R.S. 23:1221(2), defined total permanent disability as an inability “to do work of any reasonable character.” Our jurisprudence interpreted the above-quoted clause to mean disability to perform work of the same or similar description, kind or character as that which the claimant was accustomed to perform when the injury or disability occurred. Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739 (1950); Wright v. National Security Corporation, 221 La. 486, 59 So.2d 695 (1952); Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9 (1932). In time, courts began to recognize the difficulty of applying such a rule to the common laborer, who frequently went from one task to another several times within a single day. It would be unfair, these courts reasoned, to impose liability upon the employer merely because the laborer would henceforth be unable to perform the exact task in which he was engaged at the time of his injury, or because he could not do every conceivable act which a common laborer might be called upon to do. Accordingly, the courts developed the rule that a common laborer would be considered “totally and permanently disabled” only if he could no longer compete for regular employment among able-bodied workers in the flexible market for common labor.[8] See Malone & Johnson, Worker’s Compensation, Louisiana Civil Law Treatise, 1980, § 273; also Malone, Workmen’s Compensation, 12 La.L.Rev. 150, 151 (1952). At the eve of the passage of the 1975 amendments, the overwhelming majority of cases concerning total disability of a common laborer applied the above-stated test. See James v. Jake Tusa’s Restaurant and Bar, 332 So.2d 548 (La.App. 4th Cir. 1976), applying pre-1975 law; Lewis v. St. Charles Parish Hospital District, 323 So.2d 842 (La.App. 4th Cir. 1975); Bryant v. Travelers Insur. Co., 314 So.2d 379 (La.App. 4th Cir. 1975); Carlisle v. Great American Insur. Co., 291 So.2d 449 (La.App. 2d Cir. 1974); Simien v. Haas-Hirsch Estate, 278 So.2d 836 (La. 3rd Cir. 1973).
Applying the “labor market” test to the facts of this case, we affirm the trial court’s finding that Mr. Hawkins is totally and permanently disabled. Although it is true that plaintiff secured a number of jobs following his departure from J-M, it is also true that he had been unemployed for approximately one year as of the time of trial. His last position required only light exertion — sweeping and cleaning in a restaurant. Mr. Hawkins testified that it is now difficult for him to find work because prospective employers regard him as disabled. He further stated that he experiences shortness of breath if he is on his feet for any length of time or if he engages in any extended physical activity. Dr. Brown testified that, in his expert opinion, Mr. Haw *730 kins is no longer able to consistently perform even the lighter duties required of a common laborer — sweeping, walking, carrying, climbing, and so on.
It is apparent that as to this factual issue, the trial court believed the plaintiff and his doctor rather than the defendant’s expert. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Canter v. Koehring Co., supra.
We conclude that plaintiff has proven by a preponderance of the evidence that he is totally and permanently disabled, for although it may be that Mr. Hawkins will occasionally find brief, light employment such as that which was afforded him from time to time after his departure from J-M, we regard that prospect as entirely too speculative. Mr. Hawkins stands at a substantial disadvantage in the competition for regular employment among able-bodied workers in a flexible market for common labor. Accordingly, we affirm the trial court’s findings that the plaintiff is totally and permanently disabled.
Finally, with regard to the amount of the plaintiff’s award, we agree with appellant that compensation benefits should have been fixed in accordance with the statutory rate in effect in 1966, the last year of Mr. Hawkins’ employment at J-M. At that time, Louisiana law provided that the maximum compensation to be paid shall be thirty-five dollars per week,[9] not beyond four hundred weeks.[10] The plaintiff’s award, therefore, shall be reduced in conformance with the law.
Accordingly, the judgment of the trial court is amended and recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, Pat Hawkins, and against the defendant Johns-Mansville Corporation, for compensation at the rate of $35.00 per week for a period of four hundred weeks beginning June 30, 1981, with legal interest on each installment from due date until paid, and for medical expenses in the amount of $1,887.52 and for all costs, including $100.00 for medical reports.
As recast, the judgment is affirmed.
AFFIRMED.

. The trial court awarded plaintiff Hawkins weekly compensation benefits at the rate of $45.00 per week for a period not to exceed four hundred and fifty weeks. The court also awarded $1,887.52 for medical expenses and $100.00 for medical reports.

. The plaintiff testified that J-M had never informed him of these findings.

. Plaintiffs report to the doctor was erroneous — he left J-M in 1966.

. Edema is swelling caused by the increased accumulation of fluid in the tissue spaces.

. Noctural dyspnea is shortness of breath at night.

. Orthopnia — having to assume a semi-erect or erect position in bed in order to breathe more easily.

. Plaintiff’s report to Dr. Brown was to the contrary; Mr. Hawkings testified that the primary reason for seeking Dr. Brown’s advice was his shortness of breath and chest pain.

. The trial court apparently did not apply this rule. In Reasons for Judgment, it was stated that “this occupational disease (asbestosis) prevents him (plaintiff) from returning to the same or similar type of employment.” Emphasis added.

. La.R.S. 23:1202, Acts 1956, No. 411 § 1.

. La.R.S. 23:1221(2), Acts 1948, No. 175 § 1.